IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHANDRA NEMBANG, | ) | Case No. 5:21-cv-2403 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Chandra Nembang, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act.  Nembang challenges as a violation of the principle of separation of powers the structure of the Social Security Administration ("SSA"), because, under 42 U.S.C. § 902(a)(3), the Commissioner does not serve at the will of the president.  Nembang additionally contests the Administrative Law Judge's ("ALJ") denial of benefits, arguing that the ALJ misevaluated the opinion evidence and her subjective symptom complaints.

I find that Nembang lacks standing to contest the constitutionality of the ALJ's decision based on the president's removal authority.  And because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Nembang's application for SSI be affirmed.

## I.      Procedural History

Nembang applied for SSI on October 22, 2018.  (Tr. 230).[1]  Nembang alleged that she became disabled on December 1, 2017, due to: (i) gonorrhea; (ii) depression; (iii) diabetes; (iv) elevated heart rate; and (v) vaginal discharge.  (Tr. 230, 256).  The SSA denied Nembang's application initially and upon reconsideration.  (Tr. 69–79, 81–90).  Nembang requested an administrative hearing.  (Tr. 99).

On May 5, 2021, ALJ Jeffrey Raeber heard Nembang's case telephonically with the assistance of an interpreter and denied her application in a May 17, 2021 decision.  (Tr. 29–37, 44–67).  In doing so, the ALJ determined at Step Two that Nembang had medically determinable impairments of: (i) glaucoma; (ii) a history of cataract removal; (iii) hearing loss; (iv) diabetes; (v) hypertension; (vi) vitamin D deficiency; (vii) hyperlipidemia; (viii) gastroesophageal reflux disease ("GERD"); (ix) anxiety; and (x) depressive disorder.  (Tr. 31).  The ALJ concluded, however, that Nembang did not have any severe impairment or combination of impairments.  (Tr. 31–37).  On October 25, 2021, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–3).  On December 24, 2021, Nembang filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Nembang was born on February 26, 1965 and was 52 years old on the alleged onset date (Tr. 230).  Nembang could speak Nepali but could neither speak nor understand English.  (Tr. 255).  She did not have a formal education.  (Tr. 55, 257).  And she previously worked as a warehouse laborer and chicken cleaner.  (Tr. 54–55, 257).

---

[1] The administrative transcript appears in ECF Doc. 6.

### B.      Relevant Medical Evidence

Around the time of Nembang's alleged onset date, her medical history included blurry vision, diabetes, hypertension, and vitamin D deficiency.  (Tr. 421).  She also had uterine prolapse, for which she received a pessary.  *See* (Tr. 323, 425).

On December 6, 2017, Nembang visited Christopher Rooney, MD, for a follow-up on her pessary, reporting pelvic pain.  (Tr. 423).  On physical examination, Nembang had unremarkable results.  (Tr. 424).  Dr. Rooney noted that the pessary was in good condition and scheduled a follow-up.  *Id.*  Nembang was diagnosed with uterine prolapse, midline cystocele, and rectocele. *Id.*

On April 2, 2018, Nembang visited Elina Shakya, MD, reporting poor appetite, confusion after returning from a trip to Nepal, insomnia, "recurrent thoughts and anxiety about small things," elevated blood pressure, dizziness, and a blood sugar level between 130 and 170 mg/dL. (Tr. 507–08, 510).  On physical examination, Nembang had unremarkable results except elevated blood pressure (145/84).  (Tr. 511).  Dr. Shakya diagnosed Nembang with anxiety, GERD without esophagitis, hyperlipidemia, type 2 diabetes without complication, benign hypertension, vitamin D deficiency, and insomnia.  (Tr. 512).

On April 4, 2018, Nembang returned to Dr. Rooney for another pessary check, reporting discomfort.  (Tr. 432).  On physical examination, she had unremarkable results.  (Tr. 432–33). Dr. Rooney noted that the pessary was in good condition and reduced the ring size.  (Tr. 433). During a follow-up appointment on July 12, 2018, Nembang reported no adverse symptoms and her physical exam results were unremarkable.  (Tr. 437, 440–41).

On July 15, 2018, Nembang visited Dr. Shakya, reporting restlessness, "floaters" in her right eye, abdominal pain on her current dosage of metformin, and blood sugar levels ranging

from 90 to over 200 mg/dL.  (Tr. 496–97, 500).  On physical examination, Nembang had unremarkable results.  (Tr. 500).  Dr. Shakya decreased Nembang's metformin dosage and increased her anxiety medication dosage.  (Tr. 497).

On October 24, 2018, Nembang reported to Dr. Shakya knee and abdominal pain.  (Tr. 485, 488).  Nembang also reported difficulty with right-eye vision, for which she was scheduled to have cataract surgery.  (Tr. 484–85, 488).  On physical examination, Nembang had unremarkable results.  (Tr. 488).

On October 25, 2018, Nembang returned to Dr. Rooney for a follow-up, reporting right-sided pelvic pain.  (Tr. 445, 448).  Nembang stated that she did not think the pessary was working and wanted it removed.  (Tr. 448).  On physical examination, Nembang had unremarkable results.  (Tr. 449).  Dr. Rooney removed the pessary device.  *Id.*

In November 2018 and January 2019, Nembang underwent cataract surgery.[2]  (Tr. 348); *see* (Tr. 329, 371, 472, 485, 608, 615, 625, 636).  Shortly after her left eye surgery, Nembang reported "seeing well."  (Tr. 364, 368).  Her visual acuity was 20/20 -1 on the right and 20/50 +2 on the left.  (Tr. 360, 362).

On January 9, 2019, Nembang returned to Dr. Shakya, reporting an abdominal burning sensation, arthralgias, knee pain, dizziness and headaches, sleep disturbance, and a blood sugar level of 206 mg/dL.  (Tr. 471–72, 475).  She also appeared anxious.  (Tr. 475).  On physical examination, Nembang had unremarkable results, except that her hemoglobin A1c test result was 10.  (Tr. 472, 475–76, 480).  Dr. Shakya referred Nembang to an endocrinologist and increased her dosages for omeprazole and glipizide.  (Tr. 472).

---

[2] The administrative record does not include treatment notes from Nembang's first cataract surgery.

On February 25, 2019, Nembang visited Sean Wilson, DO, reporting hearing loss and bladder prolapse.  (Tr. 524, 527).  On physical examination, Nembang had unremarkable results except elevated blood pressure (145/92).  (Tr. 526).  Dr. Wilson referred Nembang to an otorhinolaryngologist, recommended aerobic exercise, and instructed her to follow up with her obstetrician.  (Tr. 526).  Dr. Wilson also ordered lab work.  *Id.*

On February 26, 2019, the results of Nembang's lab tests showed a hemoglobin A1c value of 9.7.  (Tr. 534–35).

On April 8, 2019, Nembang visited Shaun Rine, DO, to establish care.  (Tr. 381).  Nembang reported asymptomatic diabetes, well-controlled hypertension, depression (about which she had no acute concerns), and pelvic pain.  (Tr. 381–82).  On physical examination, Nembang had unremarkable results.  (Tr. 383).  Dr. Rine noted that Nembang's depression was "stable" and that Nembang's hemoglobin A1c value was 8.4, which was an improvement from 10.0.  (Tr. 383–84).  Dr. Rine increased Nembang's metformin dosage.  (Tr. 384).

On April 12, 2019, Nembang visited Bruce Sterman, MD, for hearing loss, which Nembang reported was greater on her left.  (Tr. 557, 560).  She also reported tinnitus.  *Id.*  On physical examination, Nembang had "profound" sensorineural hearing loss in the left hear; moderate to severe sensorineural hearing loss in the right ear; bilateral tinnitus; and bilateral eustachian tube dysfunction.  (Tr. 560–61).  Dr. Sterman advised Nembang to consider hearing aids and ordered an MRI to rule out lesions of the internal auditory canal and cerebellopontine angle.  (Tr. 561).

On May 30, 2019, Nembang underwent an MRI examination.  (Tr. 570–72).  The results showed:

No evidence of acute intracranial process.  No evidence of vestibular schwannoma.

Single small focus of abnormal increased FLAIR signal in the right frontal lobe subcortical white matter.  This is likely either incidental in nature or due to early chronic small vessel ischemic disease in a patient of this age.

(Tr. 570–71).

On July 8, 2019, Nembang returned to Dr. Rine, reporting that she was "doing well." (Tr. 389–90).  On physical examination, she had unremarkable results.  (Tr. 391–92).  Her hemoglobin A1c value was 7.4.  (Tr. 390, 392).  Dr. Rine made no changes to Nembang's treatment, noting that her diabetes, hypertension, and anxiety were all "stable."  (Tr. 392).

On July 10, 2019, Nembang visited Nancy Awender, MD, for a tonometry test.  (Tr. 370).  Nembang reported that her vision was "good" but that she had difficulty with "seeing things at near."  *Id.*  She also reported that her right eye felt "a little strange like something is 'blocking it.'"  *Id.*  On physical examination, Nembang's visual acuity was 20/20-1 bilaterally. (Tr. 373).  Dr. Awender diagnosed Nembang with open angle glaucoma in both eyes, moderate stage, that was in stable condition.  (Tr. 374).

On September 18, 2019, Nembang visited Danielle Kuhn, PA-C, reporting: (i) joint pain in her hand and legs going on for two to three weeks; (ii) inability to lift her arms; (iii) trouble with balance; and (iv) constant stiffness.  (Tr. 397–98).  On physical examination, Nembang had: (i) decreased left shoulder range of motion (inability to abduct or extend greater than 50°); (ii) medial joint line tenderness in the right knee; (iii) mild crepitus in the left knee; (iv) pain with movement in the shoulders, knees, and ankles; (v) pain in the left elbow joint with supination; (vi) positive Tinel's sign test in the left wrist; and (vii) decreased hand grip strength.  (Tr. 400–01).  Physician Assistant Kuhn diagnosed Nembang with polyarthralgia and GERD without

6

esophagitis.  (Tr. 401).  Physician Assistant Kuhn noted that Nembang's symptoms were vague, prescribed naproxen, and ordered lab tests.  *Id.*

On October 10, 2019, Nembang returned to Dr. Rooney for a follow-up.  (Tr. 453).  Nembang reported off and on abdominal pain in the right lower quadrant, which she rated at 5/10 in severity.  (Tr. 457).  She also reported dysuria and pelvic pain.  *Id.*  On physical examination, Nembang had unremarkable results except abdominal tenderness.  (Tr. 457–58).  Dr. Rooney ordered an ultrasound, the results of which were unremarkable.  (Tr. 458, 463–64).

On January 9, 2020, Nembang visited Dr. Rine, reporting that her diabetes was asymptomatic and that her hypertension and depression was "stable."  (Tr. 594–95).  On physical examination, she had unremarkable results.  (Tr. 597).  However, Nembang's hemoglobin A1c value was 10.5.  (Tr. 597, 599).  Dr. Rine prescribed Januvia to treat Nembang's uncontrolled diabetes.  (Tr. 597).

On February 12, 2020, Nembang visited Dr. Awender for a glaucoma exam after failing to attend follow-up appointments for seven months.  (Tr. 635, 639).  Nembang reported sensitivity to bright lights and felt like something was blocking her right visual acuity.  *Id.*  And she reported that her eyes had been "really watery for the past 3 months."  *Id.*  On physical examination, her visual acuity was 20/25.  (Tr. 637).  Nembang was diagnosed with: (i) primary open angle glaucoma, moderate stage; (ii) type 2 diabetes with mild non-proliferative retinopathy in the right eye; (iii) dermatochalasis of the upper eyelids; and (iv) pseudophakia.  (Tr. 639).  Dr. Awender ordered a selective laser trabeculoplasty and noted that Nembang's other eye conditions were "stable."  (Tr. 640–41).

On April 15, 2020, Nembang had a telephone appointment visit with Dawn Repko, MA. (Tr. 586).  Nembang reported improved blood sugar levels with her new medication and no issues with hypertension or depression.  *Id.*

On April 30, 2020, Nembang had a telephone appointment visit with Lucilyn Bullock, PA-C, to evaluate dizziness.  (Tr. 578).  Nembang reported worsening dizziness episodes accompanied by sweating.  (Tr. 579).  Physician Assistant Bullock diagnosed Nembang with dizziness, noting that she was unsure whether the information that was provided by Nembang (interpreted through her daughter) was accurate.  (Tr. 582).  Physician Assistant Bullock suggested testing.  *Id.*

In June 2020, Nembang underwent selective laser trabeculoplasty in each eye.  (Tr. 614, 619–20, 624, 627–28, 630).  On July 1, 2020, Nembang visited Dr. Awender for a follow-up, reporting that her vision was a "little better."  (Tr. 608).  On physical examination, she had 20/25 visual acuity on the right and 20/30-1 on the left.  (Tr. 610).

On October 28, 2020, Nembang returned to Dr. Rine for a check-up on her diabetes.  (Tr. 646–47).  Nembang's hemoglobin A1c value was 8.6.  (Tr. 649, 651).  During a three-month follow-up on February 1, 2021, Nembang reported that her blood sugar levels were between 110 and 130 mg/dL.  (Tr. 663–64).  On physical examination, her results were unremarkable.  (Tr. 667).  Her hemoglobin A1c value was 11.1.  (Tr. 664, 669).  Dr. Rine referred Nembang to an endocrinologist.  (Tr. 664).

C.       **Relevant Opinion Evidence**

1.       **Physical Health-Related**

a.       **Consultative Examiner: Yolanda Duncan, MD**

On December 18, 2018, Yolanda Duncan, MD, evaluated Nembang.  (Tr. 323).

Nembang reported pelvic pain and right-sided hip pain, which made it difficult for her to bend,

sit, cook, and clean.  *Id.*  She could sit for up to 30 minutes and walk about a quarter of a city

block before she experienced increased pain.  *Id.*  Nembang also reported dizziness and memory

issues.  *Id.*  On physical examination, Nembang had unremarkable results.  (Tr. 324); *see* (Tr.

319–22).  Dr. Duncan opined that Nembang "may have difficulties" when performing tasks

which required her to stand for more than an hour, walk more than a quarter of a block, and sit

for more than 30 minutes.  (Tr. 324).  Dr. Duncan also noted that it might be beneficial to

reevaluate Nembang after her surgery for uterine prolapse.  *Id.*

b.       **State Agency Consultants**

On December 23, 2018, Steve E. McKee, MD, evaluated Nembang for the presence of a

medically determinable impairment and severity based on a review of the medical record.  (Tr.

74–75).  Dr. McKee determined that none of Nembang's alleged physical impairments was

"severe."  (Tr. 75).  On February 2, 2019, Gary Hinzman, MD, concurred with Dr. McKee's

assessment.  (Tr. 86).

2.       **Mental Health-Related**

a.       **Consultative Examiner: Cheryl Benson-Blankenship, PhD**

On December 20, 2018, Cheryl Benson-Blankenship, PhD, evaluated Nembang.  (Tr.

328).  Nembang reported that she'd had chronic low-grade depression ever since she lost her job

in 2017.  (Tr. 329).  She treated her depression with medication provided by her primary care

physician, which she obtained after she told her doctor she was depressed due to having to move in with her son and daughter-in-law, but the medication did not "really ameliorate her sadness too much." *Id.*  Nembang further reported that she was sedentary and socialized with her immediate family exclusively.  (Tr. 331).  Her household consisted of her son, daughter-in-law, two grandchildren, brother-in-law, and brother-in-law's wife.  (Tr. 330).  On mental status exam, Nembang had unremarkable results except that she expressed frustration and adjustment issues. (Tr. 330–31).

Dr. Benson-Blankenship diagnosed Nembang with persistent depressive disorder, with a "[f]air prognosis."  (Tr. 331).  Dr. Benson-Blankenship opined that Nembang would have "mild" issues with focus and concentration and stress tolerance due to her "chronic mild depression." (Tr. 332–33).

### b.     State Agency Consultants

On January 4, 2019, Robyn Murry-Hoffman, PhD, evaluated Nembang for the presence of a medically determinable mental health impairment and severity.  (Tr. 75).  Dr. Murry-Hoffman found that Nembang's depression was not "severe" because she had only mild limitations in her ability to concentrate, persist, or maintain pace and adapt or manage herself. (Tr. 75–76).  On February 4, 2019, Karla Decour, PhD, concurred with Dr. Murry-Hoffman's assessment.  (Tr. 86–87).

### D.     Relevant Testimonial Evidence

Nembang testified that the conditions which impeded her ability to work were diabetes, vision loss, and hearing loss.  (Tr. 55).  She testified that she had dizziness associated with her blood sugar levels.  (Tr. 56–57).  And She testified that she obtained hearing aids but that they were not helpful.  (Tr. 57).

Nembang testified that she had chronic issues with walking and that recently she was unable to raise her right hand.  (Tr. 56).  Nembang testified that she was unable to tolerate prolonged standing.  (Tr. 57).  And she testified that she experienced pain whenever she tried to stretch or raise her hand.  (Tr. 58).

Several portions of the administrative hearing transcript were marked as "Inaudible." The portions which were not transcribed included: (i) Nembang's answer as to what impairment her standing limitation was related (Tr. 57–58); (ii) Nembang's follow-up answer as to whether she had sleep problems (Tr. 58); (iii) portions of Nembang's answer as to how her hand impairment affected her, such as the nature of her restrictions and the location of the pain (Tr. 58); (iv) Nembang's elaboration on her ability to concentrate (Tr. 58–59); and (v) as to one of the conditions Nembang listed as among the "most painful issues" (Tr. 59).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

### B.    Separation of Powers

Nembang argues that a remand is warranted because the statutory structure of the SSA governing the removal of the Commissioner is identical to that of the Consumer Financial Protection Bureau ("CFPB"), which the Supreme Court held in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*"), violated the principle of separation of powers.  ECF Doc. 7 at 8.  Nembang argues that Andrew Saul therefore lacked the authority to carry out his functions as Commissioner, which adversely affected her proceedings because: (i) the ALJ necessarily lacked the authority to hear and decide Nembang's case; and (ii) the ALJ decided her case based on policies and regulations promulgated by a commissioner who lacked authority to do so.  ECF Doc. 7 at 8–10.  And Nembang argues that President Biden's remarks when he terminated Saul suggested disapproval by the President of Saul's policy changes.  ECF Doc. 7 at 10–11.

The Commissioner concedes that the statutory removal provisions governing the SSA Commissioner violated the principle of separation of power but contends that the constitutional error was harmless because Nembang has not met her burden under *Collins v. Yellen*, 141 S. Ct. 1761 (2021), to show that the violation caused her any actual harm.  ECF Doc. 9 at 6–12.  The Commissioner alternatively argues that the separation of powers violation was harmless based on

the harmless error doctrine, the *de facto* officer doctrine, the Rule of Necessity, and prudential considerations.  ECF Doc. 9 at 12–16.

In her reply brief, Nembang argues that the unconstitutional delegation of authority was itself sufficient causation to establish actual harm: the lack of a "constitutionally valid adjudication process."  ECF Doc. 10 at 2–7.  She further argues that the doctrines cited by the Commissioner to support the violation's harmlessness do not apply.  ECF Doc. 10 at 7–8.[3]

In *Seila Law*, the Supreme Court reviewed the constitutionality of the CFPB's removal structure, which limited the president's authority to remove the CFPB Director only to instances of "inefficiency, neglect of duty, or malfeasance of office."  140 S. Ct. at 2192–93; 12 U.S.C. § 5491(c)(3).  The Court held that the limitation on the president's removal authority over a federal executive branch agency's single director violated the principle of separation of powers.  140 S. Ct. at 2192, 2197, 2211.  Not long after, *Collins* applied *Seila Law* to the Federal Housing Financial Agency's ("FHFA") removal structure, which prohibited the president from removing the FHFA Director except "for cause."  *Collins*, 141 S. Ct. at 1770, 1783; 12 U.S.C. § 4512(b)(2).  A "straightforward application" of *Seila Law* led the Court to the conclusion that the restriction on the president's authority to remove the FHFA Director was also a violation of the principal of separation of powers.  141 S. Ct. at 1784.  In both cases, the Court remanded for lower courts to determine whether the unconstitutional provisions resulted in "compensable harm."  *Collins*, 141 S. Ct. at 1789; *see also Seila Law*, 140 S. Ct. at 2211.

---

[3] At certain points in her briefing, Nembang asserts that Andrew Saul was improperly appointed, warranting a remand.  ECF Doc. 7 at 9; ECF Doc. 10 at 6–7.  She also asserts, however, that "[t]he argument raised by Plaintiff, however, was not an appointments clause challenge."  ECF Doc. 10 at 6.  Given the ambiguity in her briefing, I find that any Appointments Clause challenge Nembang may have attempted to raise is forfeited.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Before we can address the merits of Nembang's constitutional argument, the court has an obligation to ensure its jurisdiction. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Regardless of whether the parties raise or have disclaimed the issue, the court must ensure the parties have standing to raise the issue. *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019). To demonstrate standing, a plaintiff must show that she has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations omitted). An "injury in fact" must be more than an abstract asserted harm and must be an "invasion of a legally protected interest" that is: (i) concrete; (ii) particularized; and (iii) actual or imminent. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 540 U.S. at 560).

I find that Nembang has failed to establish "an injury in fact" arising from Commissioner Saul's work while he was subject to an allegedly unconstitutional removal statute. Nembang primarily argues that the separation of powers violation itself establishes sufficient harm to warrant relief, because the Commissioner therefore acted without constitutional authority, which invalidated the regulations promulgated by the Commissioner and the authority of the ALJ and Appeals Council to act on her disability claim. But that argument is foreclosed by *Collins*. 141 S. Ct. at 1788 n.23 ("[T]he unlawfulness of the removal provision does not strip the [Commissioner] of the power to undertake the other responsibilities of his office."). And, importantly, Nembang has not argued in what way these issues affected the decision in *her* claim.

Nembang's only other argument for establishing an injury in fact is that the President's language in the notice terminating Saul as SSA Commissioner suggested that President Biden

14

disapproved of his policy changes and that the President would have terminated Saul sooner but for the unconstitutional removal restriction.  For one, the statements to which Nembang refers were not made by the President but by unnamed White House officials.  ECF Doc. 10 at 4 n.1 (citing https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner (last visited October 4, 2022)).  And, again, Nembang has not articulated in what way the President's alleged statements made it more or less likely that her disability claim would have been approved.  *See Colbert v. Comm'r of SSA*, No. 5:20-CV-2234, 2022 U.S. Dist. LEXIS 32920, at *5 (N.D. Ohio Feb. 23, 2022) (rejecting an identical argument).

Absent some argument demonstrating a personal connection between the Commissioner's allegedly improper exercise of authority and the decision on her claim, Nembang asks this court to base its jurisdiction on a generalized grievance.  This has long been insufficient to establish standing.  *See Lujan*, 504 U.S. at 560 n.1 (holding that for an injury to be "particularized" the complained of conduct must have affected the plaintiff "in a personal and individual way"); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (holding that harm which affected the plaintiff and every citizen's interest in the proper application of the Constitution and laws, and relief that did not tangibly benefit him more than other citizens was not a case or controversy).

Because Nembang has not alleged a particularized injury stemming from the asserted separation of powers violation, she has failed to meet her burden of establishing standing.  *Va. House of Delegates*, 139 S. Ct. at 1950.  And we should not, therefore, consider the merits of her constitutional challenge to the SSA.

Notwithstanding Nembang's lack of standing, her constitutional challenge would nevertheless fail on the merits.  The removal provision Nembang argues is unconstitutional is

severable from the remainder of the SSA's governing statutes because the SSA would remain

fully functional if the offending removal provision were stricken.  *Fauvie v. Comm'r of Soc. Sec.*,

No. 4:20-cv-2750, 2022 U.S. Dist. LEXIS 122213, at *7–8 (N.D. Ohio July 11, 2022) (collecting

cases).  Any constitutional infirmity in the removal statute would not render Saul's appointment

invalid or, by necessity, make void the decisions of the ALJ and the Appeals Council.  *Id.* at *8–

9.  Courts have routinely rejected the argument that the ALJ or Appeals Council acted without

authority because the offending removal statute deprived Saul of authority to delegate.  *Id.* at *10

(collecting cases).  And, for the same reasons Nembang has not established standing, Nembang

also has not shown "a link between the removal provision and [her] case" such that the harm is

"particularized to [her]" in order to establish compensable harm.  *Kaufmann v. Kijakazi*, 32 F.4th

843, 850 (9th Cir. 2022); *see also Calcutt v. Fed. Deposit Ins. Corp.*, No. 20-4303, 2022 U.S.

App. LEXIS 15979, at *41–42, 44 (6th Cir. June 10, 2022) (unreported).

"[C]ourts across the country have uniformly concluded that the allegedly unconstitutional

nature of § 902(a)(3) does not require a remand."  *Fauvie*, No. 4:20-cv-2750, 2022 U.S. Dist.

LEXIS 122213, at *11 (quoting *Bryan L. v. Comm'r of Soc. Sec.*, No. 2:21-cv-2835, 2022 U.S.

Dist. LEXIS 31392, at *19 (S.D. Ohio Feb. 23, 2022)).  Nembang has not pointed to any

authority holding otherwise.  Nor has she established a basis for why her case should be the

exception.  Thus, I recommend that Nembang's constitutional challenge be rejected.

### C.     Step Two: Opinion Evidence

Nembang argues that the ALJ failed to apply proper legal standards in her evaluation of

Dr. Duncan's opinion when he "failed to consider the totality of the evidence which supported

Dr. Duncan's recommendations."  ECF Doc. 7 at 16.  The Commissioner disagrees.  ECF Doc. 9

at 22–23.

16

When evaluating a medical opinion, the ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 416.920c(a).  At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 416.920c(b)(2).[4]  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 416.920c(c)(1)-(2).

The ALJ arguably failed to apply proper legal standards in finding Dr. Duncan's opinion unpersuasive.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ found Dr. Duncan's[5] opinion of Nembang's sitting, standing, and walking limitations unpersuasive because "it merely adopts subjective complaints with no clinical or objective support.  The normal exam is inconsistent with any work related limitations."  (Tr. 35–36).  The ALJ's explanation touched upon supportability (Dr. Duncan's explanation for his findings and how consistent they were with his own objective findings).  But the ALJ did not articulate how he considered the consistency between Dr. Duncan's opinion and evidence from other sources in the record.  *See id.*

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 416.920c(c)(3)-(5).
[5] The ALJ mistakenly attributed Dr. Duncan's opinion to Joseph Iemma, MD, who is listed on Dr. Duncan's opinion as a member of University Hospital's team of internal medicine specialists.  (Tr. 35, 323).

17

The Commissioner attempts to fill the gap by pointing to the ALJ's evaluation of the state agency consultants' opinion and the ALJ's remark therein that no treating source offered an opinion suggesting work-related limitations.  ECF Doc. 9 at 22–23.  But the ALJ's reasons for why the state agency consultants' opinion was consistent with the evidence would not necessarily explain what the *ALJ's reasons* might have been for concluding that Dr. Duncan's opinion was inconsistent with the evidence – if he considered the issue at all.  *Cf. Bartolome v. Comm'r of Soc. Sec.*, No. 1:09-cv-00712, 2011 U.S. Dist. LEXIS 135918, at *27 (W.D. Mich. Nov. 28, 2011).  And we cannot accept the Commissioner's after-the-fact reasons to support the ALJ's finding as a substitute for those the ALJ did failed to give.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action … It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." (citation omitted)).

Nevertheless, I find that the ALJ's failure to comply with the regulation's articulation requirements did not cause harmful error.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009).  Once an ALJ determines that a medical source opinion is unpersuasive as unsupported by the source's own examination findings and provides a coherent explanation for why, any failure to also explain whether the source's opinion was consistent with other medical and nonmedical evidence is necessarily harmless.  *Okonski v. Comm'r of Soc. Sec.*, No. 3:20-cv-1614, 2021 U.S. Dist. LEXIS 204564, at *30 (Oct. 25, 2021); *see also DeBerry v. Comm'r of Soc. Sec.*, 352 F. App'x 173, 176 (9th Cir. 2009) (determining that an ALJ's insufficient reason was harmless when the ALJ gave other, legitimate reasons for discounting an opinion).  The lack of objective findings to support Dr. Duncan's opinion, leading to the inference that she

uncritically accepted as true Nembang's reported symptoms, was a proper basis to discount her

opinion.  *See Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 564 (6th Cir. 2014) ("[T]he ALJ

is not required to simply accept the testimony of a medical examiner based solely on the

claimant's self-reports of symptoms."); *Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005)

(holding that an opinion based solely on a claimant's self-reported symptoms "cannot support a

finding of impairment"); *see also, e.g.*, *Hague v. Comm'r of Soc. Sec.*, No. 20-13084, 2022 U.S.

LEXIS 59374, at *20–21 (E.D. Mich. Feb. 1, 2022); *Berger v. Saul*, No. 20-cv-1039, 2021 U.S.

Dist. LEXIS 46787, at *13 (W.D. Tenn. Mar. 12, 2021).

The ALJ's supportability finding, therefore, complied with the regulation and was

supported by substantial evidence.  It could also independently sustain the ALJ's decision to find

Dr. Duncan's opinion unpersuasive.  I recommend that Nembang's arguments regarding the

ALJ's handling of Dr. Duncan's opinion be rejected.

### D.       Step Two: Medically Determinable Impairment

Nembang argues that the ALJ failed to apply proper legal standards because he did not

consider whether her May 30, 2019 MRI results established the existence of a medically

determinable impairment.  ECF Doc. 7 at 15.  The Commissioner responds that the MRI results

would not on their own satisfy the regulatory standard for establishing the existence of a

medically determinable impairment.  ECF Doc. 9 at 21–22.

At Step Two, a claimant must show that she has a "severe" medically determinable

impairment.  20 C.F.R. § 416.920(a)(4)(ii).  A condition must first qualify as a "medically

determinable impairment" before the ALJ determines whether it is "severe."  20 C.F.R.

§ 416.921.  And whether a condition qualifies as a "medically determinable impairment" is

determined exclusively on the basis of objective medical evidence.  *Id.*

The ALJ did not reversibly err when he did not discuss whether Nembang's MRI results established the existence of a medically determinable impairment.  The MRI results upon which Nembang relies was inconclusive, indicating that the abnormality (a small focus of increased FLAIR signal) could be either incidental in nature or related to early chronic small vessel ischemic disease.  (Tr. 571).  Without additional diagnostic testing or objective evidence connecting Nembang's symptoms to the MRI's findings, the inconclusive MRI exam could not alone establish the existence of a medically determinable impairment separate from her hearing loss.  20 C.F.R. § 416.921; SSR 16-3, 2016 SSR LEXIS 4, at *5–6 (Mar. 16, 2016).  Thus, any remand for the ALJ to revisit the issue would be an idle and useless formality.  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."); *see also Rabbers*, 582 F.3d at 657–58.

I recommend that Nembang's arguments regarding the ALJ medically-determinable-impairment findings be rejected.

### E.     Step Two: Severity

Nembang argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence when he determined that none of Nembang's impairments was "severe."  ECF Doc. 7 at 11–19.  Nembang argues that: (i) the lack of a clear transcript makes it unclear which of her subjective complaints the ALJ found inconsistent with the evidence; (ii) the ALJ gave only a boilerplate explanation for rejecting her subjective complaints; (iii) the ALJ failed to mention or evaluate her diabetes symptoms consistent with SSR 14-2p; (iv) the ALJ's adoption of Dr. Benson-Blankenship's opinion was inconsistent with his finding that her depression was non-severe; and (v) substantial evidence did not support the ALJ's finding that

20

Nembang's arthralgias, hearing and vision loss, diabetes, genitourinary issues, and depression/anxiety were not severe. *See id.* The Commissioner argues that none of Nembang's arguments has merit. ECF Doc. 9 at 16–25.

At Step Two, a claimant must show that she has at least one "severe" impairment that can be expected to last at least 12 months. 20 C.F.R. § 416.920(a)(4)(ii) (cross-referencing 20 C.F.R. § 416.909). If the claimant does not meet this Step Two burden, the claimant is categorically *not* disabled. 20 C.F.R. § 416.920(c). However, the severity determination is a merely a threshold inquiry "intended to screen out totally groundless claims." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quotation marks omitted). A claim may only be denied at Step Two if the claimant's impairments, considered singly and in combination, "do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities." SSR 85-28, 1985 SSR LEXIS 19, at *9 (1985). Basic work activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 416.922(b).

In making his Step Two findings, the ALJ must consider the entire record, including the claimant's "statements about the intensity, persistence, and limiting effects of [her] symptoms." SSR 16-3, 2016 SSR LEXIS 4, at *10. Nevertheless, an ALJ is not required to accept a

claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15. But if the ALJ discounts or rejects a claimant's subjective complaints, he must clearly state his reasons for doing so. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); SSR 16-3, 2016 SSR LEXIS 4, at *26.

### 1. Hearing Transcript

To the extent that Nembang argues that a remand is warranted because of the quality of the administrative transcript, I find the argument insufficiently developed. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Regardless, as will be discussed below, the court's ability to review the ALJ's decision is not impaired by the quality of the transcript. *See Williams v. Barnhart*, 289 F.3d 556, 557–58 (8th Cir. 2002) ("Absent an indication that the missing portion of the transcript would bolster appellant's arguments or prevent judicial review, this Court will not remand a case based upon inaudible portions of the record."); *see also, e.g.*, *Kalar v. Saul*, No. 5:16-457, 2020 U.S. Dist. LEXIS 101803, at *6–7 (E.D. Ky. June 10, 2020); *Mireles v. Comm'r of Soc. Sec.*, No. 1:13-cv-699, 2014 U.S. Dist. LEXIS 136953, at *14–15 (W.D. Mich. Sept. 29, 2014).

### 2. Physical Impairments

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in his evaluation of Nembang's physical subjective symptom complaints. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ complied with the regulations by: (i) assessing the severity of Nembang's medically determinable impairments in light of the medical evidence, her testimony, and other evidence in the record; and (ii) clearly explaining that he rejected Nembang's subjective complaints because her statements regarding the intensity, persistence,

and limiting effects of her symptoms were not consistent with the objective medical evidence.
20 C.F.R. § 416.929(c)-(d); SSR 16-3p, 2016 SSR LEXIS 4, at *10, 15, 26; (Tr. 32–35).

Contrary to Nembang's argument, the ALJ did not give a boilerplate explanation for
discounting her subjective symptom complaints.  ECF Doc. 7 at 18.  The ALJ summarized
Nembang's subjective complaints, including her testimony, and the ALJ gave an impairment-by-
impairment discussion of the evidence, with specific reasons for why each impairment did not
meet the severity standard.  (Tr. 32–34).

The ALJ first considered Nembang's vision impairment, stating that Nembang's "good
response to surgery and good vision [was] not consistent with work related visual limitations."
(Tr. 33); *see also* (Tr. 34).  Put differently, the ALJ concluded that Nembang's vision
impairments (cataract and glaucoma) responded well to treatment and did not cause more than
minimal effect of her ability to do work related tasks.  *See id.*; SSR 85-28, 1985 SSR LEXIS 19,
at *9.  And the ALJ cited substantial evidence to support that conclusion.  (Tr. 33 (citing Tr.
375–76, 607–20)).

Second, the ALJ considered Nembang's hearing impairment.  (Tr. 33–34).  The ALJ gave
two reasons for discounting Nembang's hearing-related subjective complaints: (i) Nembang's
lack of treatment for, and subjective complaints of, hearing loss after April 2019 indicated that
she did not have a severe hearing impairment; and (ii) the ALJ's impression that Nembang
"remained able to effectively communicate, as evidence by her ability to participate in the
hearing via interpreter and her physician's note that she could communicate well in her native
language even during the reported symptoms."  (Tr. 33).  It was not improper for the ALJ to
consider Nembang's lack of follow-up treatment as a reason for discounting her subjective
symptom complaints.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("A

23

'reasonable mind' might therefore find that the lack of treatment … indicated an alleviation of White's symptoms."); *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertion of disabling pain."). And the record supports the ALJ's conclusion that Nembang neither sought treatment for hearing loss nor reported symptoms of hearing loss after her visit to Dr. Sterman. *See* (Tr. 390, 400–01, 457, 578–79, 586–87, 595, 647, 664).

The ALJ could also, consistent with the regulations, consider his observations of Nembang's hearing ability at the administrative hearing as one among several factors in his analysis. *Sorrell v. Comm'r of Soc. Sec.*, 656 F. App'x 162, 171 (6th Cir. 2016) ("[O]bservations of a claimant's behavior at a hearing are material, relevant, and admissible factors for the ALJ's consideration." (internal quotation marks omitted)). That Nembang could communicate effectively in her native language, however, would not necessarily be inconsistent with functional limitations resulting from hearing loss. (Tr. 560–61); *see Fleischer*, 774 F. Supp.2d at 877. But although that reason might not logically confirm the ALJ's decision to discount Nembang's subjective complaints of hearing loss, his other reasons could independently support it. *Rabbers*, 582 F.3d at 654.

Third, the ALJ considered Nembang's genitourinary impairment, finding that although she reported pain, she did not follow up on her uterine prolapse after 2019 and her clinical exam results were unremarkable. (Tr. 33). As discussed above, the lack of follow-up treatment is a proper basis upon which to discount a subjective symptom complaint. *See White*, 572 F.3d at 284; *Strong*, 88 F. App'x at 846. So too is the lack of objective exam findings corroborating a

claimant's pain symptoms.  *See* 20 C.F.R. § 416.929; SSR 16-3, 2016 SSR LEXIS 4, at *15.

And both reasons were supported by substantial evidence.  Nembang did not report pelvic or

abdominal pain after 2019.  *See* (Tr. 578–79, 586, 595, 646–47, 664).  And her physical

examination results were unremarkable during the same period.  (Tr. 463–64, 597, 667).

Fourth, the ALJ considered Nembang's arthralgias, finding that the evidence did not

establish that it satisfied the 12-month durational requirement because: (i) the only evidence in

the record documenting the impairment and associated functional limitations was her September

30, 2019 visit to Physician Assistant Kuhn; and (ii) Nembang's physical examination were

overall unremarkable.  (Tr. 33-34).  Both reasons were consistent with the regulations and

supported by substantial evidence.  20 C.F.R. §§ 416.909, 416.929.  Nembang reported

arthralgias on October 24, 2018, January 9, 2019, and September 28, 2019.  (Tr. 398, 475, 488).

And with the exception of her September 28, 2019 treatment notes, Nembang's physical

examination results were unremarkable for musculoskeletal abnormalities.  (Tr. 319–22, 383,

391–92, 424, 432–33, 449, 457–58, 475–76, 488, 500, 511, 526, 597, 667).

Last, the ALJ considered Nembang's diabetes, which the ALJ found nonsevere due to the

lack of any associated symptoms or complications reflected in the medical record.  (Tr. 33–34).

The ALJ's reason was consistent with the medical record, including treatment notes repeatedly

stating that Nembang's diabetes was asymptomatic.  (Tr. 381, 390, 512, 586, 595).  Nembang

faults the ALJ's analysis because he did not mention SSR 14-2p, which provides guidance on

how the SSA evaluates diabetes.  SSR 14-2p, 2014 SSR LEXIS 4 (June 2, 2014).  But an ALJ

does not err by not explicitly mentioning an applicable SSR so long as his analysis was

consistent with what it required.  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 834 (6th

Cir. 2006).  And Nembang has not argued in what way the ALJ's analysis was inconsistent with

SSR 14-2p.  *See generally* ECF Doc. 7; ECF Doc. 10.  She argues, rather, that she had diabetes complications which would have lasted more than 12 months – retinopathy and neuropathy. ECF Doc. 7 at 15.  But Nembang has not pointed to, and independent review has not revealed, any evidence of neuropathy.  And although there is evidence of retinopathy, it was noted to be stable.  (Tr. 639).  Moreover, the ALJ's severity finding of Nembang's diabetes was not based exclusively on the durational requirement but on the additional lack of any work-related limitations.  (Tr. 34).

I am sensitive to the fact that Nembang's burden at Step Two is not an onerous one.  But the Step Two standard is not "toothless."  *Kirby v. Astrue,* 500 F.3d 705, 708 (8th Cir. 2007). And on judicial review, the issue isn't whether the evidence establishes a severe impairment, but whether the ALJ's analysis was consistent with the regulations and whether his reasons for reaching the opposite conclusion were supported by substantial evidence.  42 U.S.C. § 405(g); *Rogers,* 486 F.3d at 241.  Here, they were.  So even though Nembang presented evidence which could have met the Step Two standard, that would not be enough to warrant overturning the ALJ's decision.  *O'Brien,* 419 F. App'x at 416.  Thus, I find no basis to remand on Nembang's challenge to ALJ's Step Two finding that her physical impairments were not severe.

### 3.    Mental Health Impairments

When evaluating mental health impairments at Step Two, the ALJ must consider the paragraph B functional areas ordinarily evaluated at Step Three.  20 C.F.R. § 416.920a(c)(3) (cross-referencing 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00E).  The paragraph B functional areas are: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00E.  A claimant's degree of limitation in these four functional areas is

rated on a five-point scale: from "none" to "extreme." 20 C.F.R. § 416.920a(c)(4).  A rating of "none" or "mild" will ordinarily result in a finding that the impairment is not severe. 20 C.F.R. § 416.920a(d)(1).

The ALJ also applied proper legal standards and reached a decision supported by substantial evidence in his evaluation of Nembang's mental health subjective symptom complaints. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations when he: (i) analyzed the impact of Nembang's mental health impairments on the four paragraph B areas of mental functioning; and (ii) and stated that Nembang did not have a severe impairment because none caused more than "mild" limitations in any of the functional areas and the evidence did not otherwise indicate that they caused more than a minimal limitation in her ability to perform basic work activities. 20 C.F.R. § 416.920a(c)(3), (d)(1); (Tr. 35).

The ALJ also provided sufficiently clear reasons supported by substantial evidence for finding that Nembang's impairments caused no more than "mild" limitation:

> The first functional area is understanding, remembering or applying information. In this area [Nembang] has no limitation. [Nembang] does not speak English. During an interview with the Field Office, she appeared to have no need for assistance understanding and answering questions, except that she needed a translator. (3E/2) [Nembang] enjoys reading in her native language. (3F/2) She knows most of the English alphabet. (3F/3) She was estimated to have average intelligence. (3F) She understood questions posed through a translator at the hearing.

> The next functional area is interacting with others. In this area, [Nembang] has no limitation. She and her husband live with her brother and sister-in-law. Their young grandchildren also live in the home. She has a relationship with her daughter. (4E/1; 2F/5; 3F/3) She made an unremarkable social presentation at the consultative exam. She reported a positive relationship with most of her immediately family members. She enjoyed her grandchildren. She worked on one job for two years and another job for three years. She did well interpersonally on those jobs. (3F) There was no indication of issues getting along with treating sources.

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. [Nembang] maintained factory work in the past from 2014-2017. (1E/1) She was able to track the flow of conversation adequately during the consultative exam. (3F) She also maintained adequate focus to participate in her hearing.

The fourth functional area is adapting or managing oneself. In this area, [Nembang] has mild limitation. She does some cleaning and cooking for herself. (4E/1) [Nembang] currently deals with stress and pressure with spending time with her immediate family. She did not report a pattern of inability to adjust to workplace demands when she worked for the poultry job and also the factory job. There is no reported history of mental or emotional deterioration in response to workplace exposure. (3F).

(Tr. 33–34).

The only basis upon which Nembang challenges the ALJ's analysis of her mental health impairments is that his severity finding was inconsistent with his finding that Dr. Benson-Blankenship's opinion was persuasive. ECF Doc. 7 at 17; (Tr. 36). But as the Commissioner notes, Dr. Benson-Blankenship's opinion was that Nembang would have "mild" issues with focus and concentration and stress tolerance. (Tr. 332–33). That opinion would be *consistent* with the ALJ's finding that Nembang had *mild* limitations in her ability to concentrate, persist, and maintain pace. (Tr. 35).

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence in his evaluation of subjective symptom complaints, the ALJ's finding that none of Nembang's impairments was "severe" fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

## IV.    Recommendation

Because Nembang lacks standing to raise her constitutional challenge and because the ALJ otherwise applied proper legal standards and reached a decision supported by substantial

evidence, I recommend that the Commissioner's final decision denying Nembang's application for SSI be affirmed.

Dated: October 4, 2022

Thomas M. Parker
United States Magistrate Judge

_____

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).